**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| MARY M. ARENO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:12 CV 1669 DDN |
| | ) |
| CAROLYN W. COLVIN,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Mary M. Areno for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, et seq., and supplemental security income under Title XVI of that Act, 42 U.S.C. § 1381, et seq. For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

**I.  BACKGROUND**

Plaintiff Mary M. Areno, born September 27, 1976, filed applications for Title II benefits and Title XVI benefits on July 3, 2007. (Tr. 89-98.) She alleged an onset date of disability of January 1, 2006, due to arthritis, back problems, depression, endometriosis, headaches, anxiety, and knee problems. (Tr. 121-22.) Plaintiff's applications were denied initially on September 5, 2007, and she requested a hearing before an ALJ. (Tr. 52-57.)

On July 24, 2008, following a hearing, the ALJ found plaintiff not disabled. (Tr. 11-19.) On January 11, 2010, the Appeals Council denied plaintiff's request for review. (Tr. 1-3.) On March 11, 2010, plaintiff filed for judicial review in this court. However, on May 25, 2010, the Commissioner moved to reverse and remand, which the court granted. (Tr. 608-11.) On September 19, 2011, following another hearing, the ALJ again found plaintiff not disabled. (Tr. 525-50.) On May 31, 2012, the Appeals Council again denied plaintiff's

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The court hereby substitutes Carolyn W. Colvin as defendant in her official capacity. Fed. R. Civ. P. 25(d).

request for review.  (Tr. 586-89.)  Thus, the subsequent decision of the ALJ stands as the final decision of the Commissioner.

## II.  MEDICAL HISTORY

In March 1984, the Special School District of St. Louis County evaluated plaintiff's speech and language and recommended her placement into the Individualized Education Program. (Tr. 777-89.)  Her objectives included speaking in complete sentences and proper pronunciation. (Tr. 770.)  On March 13, 1987, the Special School District of St. Louis County evaluated plaintiff's speech and language and recommended plaintiff's removal from the Individualized Education Program.  (Tr. 756.)

On October 4, 2000, plaintiff complained that she felt that people walking by her watched her and planned to kill her.  Greg Mattingly, M.D., diagnosed schizoaffective disorder. (Tr. 196.)

On November 10, 2000, plaintiff reported that she punched herself in the jaw due to jaw pain.  Dr. Mattingly recommended that she continue on Zyprexa and Wellbutrin and prescribed Ativan.[2] (Tr. 196.)

On March 30, 2004, plaintiff reported that she obtained employment as a home health aide. (Tr. 195.)

On November 15, 2004, plaintiff reported that she recently ended a relationship and resided in a relative's basement.  She also complained of pain and stated that she felt that the poles on her street followed her.  Dr. Mattingly diagnosed her with paranoid depression and pain.  (Tr. 370.)

On February 28, 2005, plaintiff complained of severe back pain.  (Tr. 369.)

On June 22, 2005, plaintiff arrived at the emergency room and complained of left hip pain as a result favoring her left side due to a prior right ankle injury.  She further complained of pain in the left knee and right ankle and chronic back pain.  She left because Melissa Maerz-Malone, NP, did not give her pain medication, and she refused an X-ray.  (Tr. 333-42.)

On June 24, 2005, plaintiff complained of lower back, hip, knee, and leg pain and emphasized her left hip and right ankle pain.  She twisted her ankle three weeks earlier.  She also complained of tension headaches.  Sam Page, M.D., noted that she appeared

---

[2]   Zyprexa is used to treat mental or mood conditions.   WebMD, http://www.webmd.com/drugs (last visited September 19, 2013).   Wellbutrin is an antidepressant used for smoking cessation and to treat mental or mood conditions.  Id. Ativan is used to treat anxiety.  Id.

anxious, animated, and depressed.  His impressions included myofascial low back and left hip pain and anxiety disorder.  He referred her to physical therapy and recommended a TENS unit.[3]  He also prescribed Zanaflex but denied her request for narcotics.[4]  (Tr. 200-01.)

On July 8, 2005, plaintiff arrived at the emergency room and complained that she fell and injured her left ribs.  Plaintiff again refused an ankle X-ray and left before receiving prescriptions or her discharge papers.  Vickie Carll, ANP, diagnosed rib contusion, rib fracture, and ankle sprain.  (Tr. 314-32.)

On August 16, 2005, plaintiff complained of neck, back, and hip pain.  She reported difficulty finding a place to live.  She attended physical therapy once but did not return due to lack of transportation.  Dr. Page observed her flat affect and depressed mood.  He diagnosed myosfascial low back pain and depression.  (Tr. 198-99.)

On October 9, 2005, plaintiff arrived at the emergency room and complained of low back pain and dysuria.[5]  Gerardo Gutierrez, M.D., diagnosed chronic back and abdominal pain.  (Tr. 260-73.)

On January 22, 2006, plaintiff arrived at the emergency room and complained of back pain that movement exacerbated, right foot numbness and tingling, and headaches.  She further complained that the back pain radiated to her right foot.  Angela Majino, M.D., diagnosed chronic back pain.  She observed that plaintiff could not stay awake, appeared poorly groomed, arrived in a wheelchair, and walked with a gait.  She prescribed Robaxin.[6]  Upon discharge, plaintiff walked without assistance and drove home.  (Tr. 288-98.)

On March 8, 2006, plaintiff arrived at the emergency room and complained of neck, low back, and right shoulder pain due to a motor vehicle accident.  X-rays of her lumbar and cervical spine and right shoulder were negative.  (Tr. 203-14.)

---

[3] TENS, or transcutaneous electrical nerve stimulation, is a back pain treatment that uses low voltage electric current to relieve pain.  WebMD, http://www.webmd.com/back-pain/guide/tens-for-back-pain (last visited September 19, 2013).  TENS is typically done with a TENS unit, a small battery-operated device.  Id.

[4] Zanaflex is used to treat muscle spasms.  WebMD, http://www.webmd.com/drugs (last visited September 19, 2013).

[5] Dysuria is difficulty or pain in urination.  Stedman's Medical Dictionary, 604 (28th ed., Lippincott Williams & Wilkins 2006) ("Stedman").

[6] Robaxin is used to treat muscle spasms and pain.  WebMD, http://www.webmd.com/drugs (last visited September 19, 2013).

On April 21, 2006, plaintiff arrived at the emergency room and complained of right hip pain that radiated down her right leg, back pain, nausea, and headaches. She reported that she took narcotics from her disabled boyfriend. Dr. Patel denied her requests for narcotics and diagnosed her with chronic pain and drug-seeking behavior. (Tr. 243-53.)

On July 28, 2006, plaintiff arrived at the emergency room and complained of right shoulder and foot pain caused by her jumping thirty to forty feet off a cliff into water. She smelled of alcohol and requested pain medication. Richard Tao, M.D., diagnosed shoulder sprain, back sprain, and foot fracture. (Tr. 222-34.)

On May 17, 2007, plaintiff arrived at the emergency room and complained of a twisted left knee and minor ankle pain. John Shuman, PA-C, diagnosed left knee sprain, performed a splint procedure, and gave her crutches. (Tr. 275-87.)

On July 12, 2007, plaintiff arrived at the emergency room and complained of abdominal, back, and left leg pain, stress-induced incontinence, constipation, and endometriosis.[7] Robert Abbott, M.D., diagnosed endometriosis. (Tr. 300-13.)

On August 10, 2007, plaintiff arrived at the emergency room and complained of pain in the great toe of her right foot. Yolanda Acklin, ANP, diagnosed paronychia.[8] (Tr. 372-87.)

On August 16, 2007, plaintiff received a psychological evaluation from Michael Armour, PhD. Dr. Armour diagnosed severe recurrent major depression, depressive schizoaffective disorder, pain disorder associated with psychological factors and her back condition, cannabis, amphetamine, and opioid abuse, and physical and possible sexual abuse as an adult. He gave her a GAF score of 45-50.[9] Dr. Armour found that she suffered moderate impairments with daily activities, moderate to severe impairments with social functioning, and moderate impairments with concentration, persistence, and pace. He also

---

[7] Endometriosis is the congenital displacement or malposition of the mucous membrane of the inner layer of the uterine wall. Stedman at 610, 641.

[8] Paronychia is the inflammation of the nail fold surrounding the nail plate forming pus. Stedman at 1426, 1871.

[9] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worse of the two components.

A GAF score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32–34 (4th ed. 2000) ("DSM-IV-TR").

found that she suffered from repeated episodes of deterioration in work-like settings due to her prior psychiatric hospitalizations.  He further found her cognitively able to manage funds but questioned the credibility of her allegation that she had not used illegal drugs for seven years due to an inconsistent medical record.  (Tr. 345-50.)

On August 31, 2007, Kyle DeVore, Ph.D., submitted a Psychiatric Review Technique form regarding plaintiff.  He found that she suffered from recurrent major depressive disorder, depressive schizoaffective disorder, pain disorder with psychological factors, personality disorder, and polysubstance abuse or dependence.  He indicated that she suffered moderate restrictions regarding her abilities to perform activities pursuant to a schedule, maintain regular attendance, arrive punctually within customary tolerances, complete a normal work schedule without interruptions due to psychological symptoms, and perform at a consistent pace without an unreasonable number or length of breaks.  He further found that she suffered marked restrictions with daily living activities, moderate difficulties with social functioning, and moderate difficulties with maintaining concentration, persistence, and pace.  He concluded that her impairments were severe but did not meet or equal any listed conditions and that her allegations were partially credible. (Tr. 351-361.)

On August 31, 2007, Dr. DeVore also submitted a Mental Residual Functional Capacity Assessment.  He found that she could follow one or two step directions and perform simple work-related tasks, relate adequately to peers and supervisors, and adapt to routine work environment changes.  (Tr. 362-64.)

On October 12, 2007, plaintiff arrived at the emergency room and complained of joint pain.  William Weston, M.D., diagnosed pain and generalized anxiety.  (Tr. 388-401.)

On November 2, 2007, plaintiff arrived at the emergency room and complained of a headache that began two weeks earlier and radiated to her neck, jaw, back, and arms.  She arrived with a mouth guard in place to prevent her teeth from grinding.  She received a head CT scan, which revealed mild ethmoid sinus disease.  Nurse practitioner Carll diagnosed a headache.  (Tr. 402-39.)

On November 12, 2007, plaintiff received a psychiatric evaluation from Sekhar Vangala, M.D.  He diagnosed recurrent major depressive disorder accompanied by psychosis and polysubstance abuse in full sustained remission and gave her a GAF score of

- 5 -

50.  He planned to rule out schizoaffective disorder and paranoid schizophrenia and to obtain her medical records.  He prescribed Abilify and Remeron.[10]  (Tr. 516-21.)

On November 14, 2007, Robert Baird, M.D., stated that plaintiff's medical conditions would prevent her from working for at least the next six months.  (Tr. 431.)

On November 15, 2007, plaintiff received cervical and lumbar spine MRIs.  Dr. Baird found mild to moderate disc bulging and subtle reversal of normal curvature at C5-C6, small disc bulging and herniation and foramen narrowing at T1-T2.[11]  He further found small disc herniation and mild foramen narrowing at L5-S1 and very mild disc bulging at L4-L5 with no foramen encroachment.  (Tr. 365-67.)

On December 21, 2007, plaintiff met with Ali Zarmeena, M.D., for pain management and complained that she experienced pain throughout her body, which she rated as 8 of 10.   Dr. Zarmeena assessed fibromyalgia.[12]   She prescribed Lyrica, Darvocet, and Gabapentin.[13]  (Tr. 481-86.)

On January 3, 2008, plaintiff met with Dr. Vangala and complained of severe pain.  Dr. Vangala noted that she missed her previous two appointments and failed to comply with his prescribed medication regimen.  He prescribed Alprazolam, increased her Remeron and Abilify prescriptions, and instructed her on the importance of compliance.[14]  (Tr. 514.)

On February 19, 2008, plaintiff met with Dr. Zarmeena and continued to complain of pain in her low back and legs.  She reported that she performed stretching exercises at

---

[10]   Abilify   is   used   to   treat   mental   or   mood   disorders.   WebMD, http://www.webmd.com/drugs (last visited September 19, 2013).   Remeron is an antidepressant used to treat mental or mood disorders.  Id.

[11] The human spinal column consists of thirty-three vertebrae.  There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx).  The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back.  The sacrum is immediately below the lumbar vertebrae.  Stedman at 2117-18.

[12] Fibromyalgia is a common syndrome of unknown cause of chronic widespread soft tissue pain accompanied by weakness, fatigue, and sleep disturbances.  Stedman at 725.

[13] Lyrica is used to treat nerve pain caused by spinal cord injury or fibromyalgia.  WebMD, http://www.webmd.com/drugs (last visited September 19, 2013).  Gabapentin is used to relieve nerve pain and control seizures.  Id.

[14]   Alprazolam   is   used   to   treat   anxiety   and   panic   disorders.   WebMD, http://www.webmd.com/drugs (last visited September 19, 2013).

home.   Dr. Zarmeena noted that plaintiff recent MRI scan did not indicate cord impingement.  (Tr. 473-76.)

On March 13, 2008, plaintiff arrived at the emergency room and complained of pain in her abdomen and back.  David Fouts, M.D., diagnosed back pain.  (Tr. 433-54.)

On March 17, 2008, plaintiff complained that she could not remain asleep for longer than an hour and that when depressed she heard voices instructing her to kill herself.  Dr. Vangala prescribed Trazadone.[15]  (Tr. 512.)

On April 22, 2008, plaintiff received an evaluation for her neck, arm, and low back pain.  She attributed the pain to injuries incurred by gymnastics and rated her back pain as the most severe.  She described her back pain as dull and aching and stated that it radiated to her legs and feet.  She also reported intermittent numbness in her hips and feet.  Movement and sitting for long periods exacerbated her back and leg pain.  She stated that her neck pain radiated to both wrists.  She reported diminished grip strength and intermittent numbness in both hands.  She complained of headaches that caused nausea and vomiting when severe.  She reported light and sound sensitivity.  Edward Braun, M.D., assessed lumbar displaced disc, cervicobrachialgia, migraine headaches, other chronic pain, depression, and tobacco abuse.[16]   He prescribed oxycodone HCl, referred her to physical therapy, and scheduled a selective nerve root block for her spine.[17]  (Tr. 456-58.)

On April 28, 2008, Dr. Vangala submitted a residual functional capacity assessment regarding plaintiff.  He indicated that she had poor aptitude for completing a normal work schedule without interruptions from her psychological symptoms, performing at a consistent pace without an unreasonable number or length of breaks, independently setting realistic goals or plans, cope with the stress of semiskilled or unskilled work, adhering to basic standards of neatness and cleanliness, and traveling to unfamiliar places. He found moderate restriction with daily living activities, moderate to marked difficulties with social functioning, and that she often suffered deficiencies in concentration, persistence, and pace.  He also noted that plaintiff suffered from back, arm, and hand pain

---

[15] Trazodone is an antidepressant used to treat mental or mood conditions.  WebMD, http://www.webmd.com/drugs (last visited September 19, 2013).

[16] Cervicobrachialgia is pain in the neck radiating to the arm due to compression of nerve roots of the cervical spinal cord.   The Free Dictionary, http://medical-dictionary.thefreedictionary.com/cervicobrachialgia (last visited September 19, 2013).

[17] Selective nerve root block is local anesthesia injected near a spinal nerve to identify which nerve is causing medical problems.   WebMD, http://www.webmd.com/back-pain/tc/herniated-disc-exams-and-tests (last visited September 19, 2013).

and that standing, sitting, walking, and stress precipitated her pain.  He further noted that her medications impair her ability to work.  He diagnosed her with psychosis and gave her a GAF score of 50-55.[18]  (Tr. 501-06.)

On February 9, 2009, plaintiff met with Sanjeez Kamat, M.D., at St. Louis Psychiatry Doctors Group.   Dr. Kamat diagnosed schizoaffective disorder and attention deficit hyperactivity disorder (ADHD).  (Tr. 949.)

On May 7, 2009, plaintiff complained of back pain.  Dr. Baird diagnosed hepatitis C, tobacco use, and lumbago.[19]  (Tr. 903-04.)

On May 22, 2009, Dr. Baird opined that plaintiff was disabled due to her chronic, poorly controlled pain caused by the bulging disks in her neck and lumbar spine.  (Tr. 799.)

On July 6, 2009, plaintiff reported sadness, depression, and panic attacks.  She also reported that she mistakenly stole from a store and that she did not know her court date.  Dr. Kamat diagnosed plaintiff with anxiety disorder.  (Tr. 945-46.)

On December 6, 2010, plaintiff complained of insomnia and pain in both knees.  Dr. Baird assessed osteoarthritis in her lower legs and fibromyalgia.  (Tr. 883-84.)

On December 28, 2010, Dr. Kamat submitted an evaluation regarding plaintiff.  Dr. Kamat diagnosed plaintiff with schizoaffective disorder, ADHD, and anxiety disorder.  Dr. Kamat opined that plaintiff would have difficulty working full-time on a sustained basis due to her symptoms.  He indicated that she had poor ability to follow work rules, relate to co-workers, interact with supervisors, cope with work stress, and maintain concentration and attention.  He found that her impairments would cause her to miss more than three days of work per month.  He further found slight restriction with her daily living activities, marked difficulties with social functioning, frequent difficulties with concentration, persistence, and pace, and frequent episodes of extended decompensation.  He gave her a GAF of 60 and stated that her highest GAF during the previous year was 70.[20]  (Tr. 801-05.)

On December 30, 2010, plaintiff complained of vaginal discharge and pain during sexual intercourse and urination and raised questions regarding fertility.  Nicole Xynos,

---

[18]  A score from 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers).  DSM-IV-TR at 34.

[19]  Lumbago is pain in the middle and low back.  Stedman at 1121.

[20]  A GAF score from 61–70 is indicative of some mild symptoms or some difficulty in social or occupational functioning but with a general ability to function well and to have some meaningful interpersonal relationships.  DSM–IV–TR, at 34.

M.D., noted plaintiff's previous endometriosis diagnosis and her previous related surgeries. She diagnosed irregular menstruation and dysuria and planned to screen for venereal disease.  (Tr. 880-82.)

On January 6, 2011, plaintiff received a pelvic ultrasound, which Harry Greditzer, M.D., found negative.  On January 26, 2011, plaintiff received X-rays of her right and left knees, which Mehrdad Sehizadeh, M.D., found unremarkable.  She also received a brain MRI.  Aurora Gonzalez, M.D., found a meniscal microadenoma to the left of the pituitary gland but no evidence of pituitary gland enlargement.  (Tr. 1015-19.)

On January 27, 2011, plaintiff complained of galactorrhea, frequent urination, occasional incontinence.  Dr. Xynos observed that although her MRI did not conclusively indicate prolactinoma, plaintiff suffered the associated symptoms.[21]  Dr. Xynos referred her to endocrinology and urology.  (Tr. 1011.)

On March 1, 2011, plaintiff complained of right shoulder pain.  Dr. Baird ordered an X-ray, which revealed slight widening of the acromioclavicular joint.[22]  (Tr. 1008-09, 1014.)

On March 4, 2011, plaintiff received an evaluation for her elevated prolactin levels. Judith Dunai, M.D., found plaintiff's prolactin levels normal and opined that her medications caused the elevated levels.  (Tr. 950-52.)

On March 24, 2011, plaintiff saw Trusharth Patel, M.D., to manage her neck, low back, and extremity pain.  Plaintiff reported that the pain centered in the back of her neck and radiated down her shoulders.  Dr. Patel assessed cervical and lumbosacral spondylosis, migraine or tension headaches, other chronic pain, depression, tobacco abuse, insomnia, and hepatitis C.[23]  Dr. Patel stressed the importance of exercising and stretching and discussed that although plaintiff received epidural steroid injections, therapy remained the most critical part of her treatment.  (Tr. 957-62.)

On March 24, 2011, plaintiff complained of headaches of increased severity that occurred almost daily.  Dr. Baird prescribed Topamax.[24]  (Tr. 1003-04.)

---

[21]  Prolactinoma is a pituitary adenoma composed of prolactin-producing cells, which causes amenorrhea and galactorrhea.  Stedman at 27.

[22]  Acromioclavicular refers to a joint in the shoulders.  Stedman at 19.

[23]  Spondylosis is the stiffening of fixation of the vertebra.  Stedman at 95, 1813.

[24]  Topamax is used to prevent migraine headaches.  WebMD, http://www.webmd.com/drugs (last visited September 19, 2013).

On April 13, 2011, plaintiff reported pain on the top of both feet and that she twisted her left foot two weeks ago.  Zachary Newland, DPM, ordered a left foot X-ray and diagnosed a left foot contusion.  (Tr. 1047.)

On May 6, 2011, plaintiff complained that she could not turn a door knob with her left hand.  She stated that she received a diagnosis of carpel tunnel syndrome one year earlier and experienced similar but less severe symptoms with her right hand.  Paul Kotzbauer, M.D., assessed backache and carpel tunnel syndrome and ordered an electromyogram and nerve conduction studies.[25]  (Tr. 1036-41.)

On October 12, 2011, Dr. Newland submitted an evaluation regarding plaintiff.  He diagnosed fibromyalgia, bursitis, foot pain, and osteoarthritis.  He found that she could sit for at least six hours during an eight-hour workday, stand or walk for less than two hours, and would require a sit/stand option.  He also found that she would require fifteen minute breaks every hour and that prolonged sitting would require leg elevation.  He further found that she could rarely lift less than ten pounds and could never lift ten pounds or more, twist, stoop, bend, crouch, or climb ladders or stairs.  He noted that depression affected her pain, that her pain constantly interfered with attention and concentration, and that her ability to cope with stress was markedly limited.  He anticipated that she would miss more than three days of work per month due to her impairments.  He based his findings on her spinals MRIs.  (Tr. 1071-72.)

On February 22, 2012, Dr. Kamat opined that plaintiff could not work due to her psychological condition.  (Tr. 1073.)

**Testimony at the Hearing**

The ALJ conducted a hearing on July 8, 2008.  (Tr. 25-47.)  Plaintiff testified to the following.  She lives in a house with her parents and six brothers and sisters.  She has no GED or vocational training.  She last worked as a home health aide for Edna Myers for five or six months in 2000 or 2001 and received payment directly from her client's son.  She received no training as a home health aide.  In the 1990s, she received a workers compensation settlement after working for Pizza Hut.  She once spent six hours in jail and also received a DUI.  Although she has been to rehabilitation for drugs and alcohol on several occasions, and her last stint occurred in 1994 or 1995.  (Tr. 28-30, 35.)

---

[25] An electromyogram (EMG) measures the electrical activity of muscles at rest and during contraction.   WebMD,   http://www.webmd.com/brain/electromyogram-emg-and-nerve-conduction-studies (last visited September 19, 2013).  Nerve conduction studies measure how well and how fast the nerves can send electrical signals.  Id.

Plaintiff received a diagnosis for a herniated disc in November 2007.  Her onset date is January 1, 2006 due to her mental impairment, which caused her to visit the emergency room that year.  Since September 2007, she has received therapy from Dr. Vangala once per month at Jewish Family Services.   (Tr. 32.)

During a typical day, she awakens sometime between 6:00 a.m. and 6:00 p.m.  She has no set schedule, and her routine varies substantially on a day-to-day basis.  On good days, she may shower, although she does not have many good days.  On bad days, she lays around and may become ill.  Specifically, she vomits two or three times per month and feels sick constantly.  She eats mostly microwaveable meals and cleans once per week.  She spends ninety-five percent of the time lying due to feeling ill, back pain, or drowsiness.  She experiences pain constantly, which varies in severity from 5 to 8 of 10.  For pain relief, she uses ice, heat, and pain medication.  She uses ice or heat two or three times per day in forty-five minute intervals.  She also lies down to relieve pain.  (Tr. 33-36.)

She does not know how long she can sit because she spends most of her time lying.  She can walk and stand no longer than ten minutes.  She has no hobbies and rarely leaves her home.  (Tr. 36-37.)

She experiences depression, which causes her to cry two or three times per week and feel sick.  Most days, she spends the entire day in bed.  (Tr. 37-38.)

Her husband shops.  She can sit for an hour at a time and can lift no more than ten pounds.  She cooks, cleans, and launders occasionally.  She does not attend church or school.  She watches television.  She performs physical therapy exercises on a regular basis.  (Tr. 38-40.)

On March 14, 2011, following remand from the district court, the ALJ conducted another hearing.   (Tr. 559-83.)   Plaintiff testified to the following.   She lives with her husband, and her brother stays with them on occasion.  His husband is working fulltime at night.  Although her husband went to electrician school, he works as a truck driver.  He stops by their home three or four times per night to check on her.  (Tr. 561-62.)

She completed ninth grade and was hospitalized during much of sixth through tenth grade.  She received a settlement around 2000 for a bulged disk.  Ten years ago, she assisted an elderly woman with cleaning and bathing.  She obtained the job through her aunt, and the job lasted only three months.  (Tr. 562-64.)

Before age twenty-one, she was jailed two or three times and also received a DUI.  She also attended rehabilitation for drugs, alcohol, and depression ten to fifteen times during her school years.  She last smoked marijuana one month earlier but has not drank

- 11 -

alcohol for two years. She receives psychiatric help from Dr. Kamat and saw him last month. He has never asked her about marijuana use. She has smoked synthetic marijuana for pain relief. She does not inform the pain clinic of her drug use unless asked. (Tr. 564-66.)

Her routine varies substantially on a day-to-day basis. Some nights, she does not sleep, and, during the previous night, she slept one or two hours due to her anxiety and back pain. The weather exacerbates her back pain. (Tr. 567.)

She does not want to rely on social security income but wishes to undergo back surgery to return to work. She made more money waiting tables at Pizza Hut than she would from social security. Her employer fired her from her last job due to absenteeism attributable to her back problems and a work-related accident. (Tr. 568.)

She sits on a stool to wash dishes. Due to her back, she takes breaks every five to ten minutes in twenty to thirty minute intervals to complete household chores. (Tr. 569.)

She last worked in 2008 with her sister cleaning for the Service Master company. She hurt herself while working, and her employer fired her after a week. Her hands shake due to her medication, specifically Adderall, which she takes for attention deficit disorder. Other side effects from her medication include nausea, dizziness, dry mouth, and drowsiness. (Tr. 570-71, 578.)

She wears a brace on her left wrist for carpel tunnel syndrome. Waiting tables, arm wrestling, and fights resulted in four or five breaks and caused carpel tunnel syndrome. Dr. Baird, her primary care physician from the John C. Murphy Health Clinic, diagnosed carpel tunnel syndrome by listening to her describe the symptoms. Her symptoms include forearm pain and inability to hold objects. He did not order X-rays. He recommended the brace. She scheduled a nerve conduction test with a neurologist in April. She also experiences carpel tunnel syndrome in her right wrist. She sees Dr. Baird monthly. Five to seven times per month, she cannot hold a fork or cup due to the pain. The pain can last from a few hours to days and sometimes causes her to cry. She can feed herself during these painful episodes only because her hands usually do not flare up simultaneously. (Tr. 571-74, 577-78.)

She sees Dr. Kamat from St. Alexis Hospital for psychiatric care. She has received over one hundred injections in her back and last received an injection two weeks earlier. She has high prolactin levels and a pituitary gland tumor. (Tr. 576, 578-59.)

- 12 -

The ALJ postponed the hearing due to testimony regarding several undocumented medical encounters and several inconsistencies in the record before him.  The ALJ instructed plaintiff's counsel to supplement the record.  (Tr. 579-82.)

On August 22, 2011, the ALJ conducted a third hearing.  (Tr. 1074-98.)  Plaintiff testified to the following.  She lives in a home with her husband.  Her husband works from 18 to 32 hours per week.  During the past fifteen years, she worked as a waitress, elder care worker, and for Service Master cleaning soot.  At Pizza Hut, she waited tables, bussed, and served.  (Tr. 1077-79.)

She has received rehabilitation for drug and alcohol abuse six or seven times.  She was never hospitalized solely for alcohol and drug abuse but also for depression, suicide attempts, and related acts.  These hospitalizations happened five or six times.  (Tr. 1080-81.)

Her diagnosed physical impairments are fibromyalgia, chronic pain syndrome, and hepatitis C.  Degenerative disc disease in the cervical and lumbar spine cause her chronic pain.  Her diagnosed mental impairments are depression and schizophrenia.  (Tr. 1081-83.)

She cannot wash her hair because of shoulder pain that radiates down her arms.  Her husband helps her.  She cannot launder, wash dishes, clean, or dust because of her ankles, which have been constantly swollen for months.  Standing for one minute causes ankle pain.  When she washes dishes, she leans over the sink but can only wash in two minute intervals.  She has attempted to receive medical care for her ankles.  She saw Dr. Leland and Dr. Jennings.  Her doctors planned to run tests but Medicaid would not pay for them.  She also saw Dr. Neal but he could not diagnose her ankles without further testing.  She has sought pain management and received injections.  (Tr. 1084-86.)

She sleeps during the day if she has a headache.  She vomits occasionally.  She has migraine headaches.  She recently went on vacation.  Her father has cirrhosis and took his children to Florida.  On vacation, she vomited twice and stayed in her motel room at least twice when her family left.  Her family drove her to Florida, which took seventeen or eighteen hours, and she cried the entire trip.  She went to the beach a few times.  She suffered swimmer's ear and went to the emergency room.  (Tr. 1086-88, 1090.)

For the past two months, she has not performed daily stretching exercises.  Her husband shops, and she does not.  She does not bathe often.  She has not cleaned since her ankles began swelling.  She has not cooked for a year but can prepare sandwiches.  She lies most of the day due to her headaches, tension, and pain in her back, feet, and shoulders.  She does little else.  Her husband launders.  She does not attend church.  She

- 13 -

has two cats, but her husband cares for them.  She has no hobbies.  She has not driven in over a year.  (Tr. 1088-90.)

Vocational expert (VE) Delores Gonzalez also testified at the hearing.  The VE testified that plaintiff worked as a waitress, which is light, semiskilled work, and as a home health aide, which is medium, semiskilled work.  (Tr. 1093.)

The ALJ stated that plaintiff's medical records indicated that her physical impairments limit her to light exertional work and that her mental impairments limit her to unskilled work.  She further stated that she should not work in a setting that includes constant regular contact with the general public or in a setting that requires more than infrequent handling of customer complaints.  The VE responded that, assuming those limitations, plaintiff could not perform her past relevant work.  The VE further stated that she could perform as a housekeeping cleaner, which is light, unskilled work with 887,890 positions nationally, 21,660 positions in Missouri, and 9,380 positions in the St. Louis metropolitan area; mail clerk, which is light, unskilled work with 131,750 positions nationally, 3,430 positions in Missouri, and 1,680 positions in the metropolitan area; and hand presser, which is light, unskilled work with 60,440 positions nationally, 1,210 positions in Missouri, and 490 positions in the metropolitan area.  (Tr. 1094-95.)

The ALJ presented a hypothetical individual limited to sedentary exertional work with the aforementioned mental limitations.  The VE responded that such individual could perform as an addresser, which is sedentary, unskilled work with 109,470 positions nationally, 1,180 positions in Missouri, and 620 positions in the metropolitan area; table worker, which is sedentary, unskilled work with 430,450 positions nationally, 8,610 positions in Missouri, and 3,360 positions in the metropolitan area; and sticker, which is sedentary, unskilled work with 239,550 positions nationally, 5,990 positions in Missouri, and 2,800 positions in the metropolitan area.  (Tr. 1095.)

The ALJ inquired as to whether the aforementioned jobs allowed for a sit/stand option.  The VE responded that the sticker and table worker positions and about half the mail clerk positions would allow for a sit/stand option.  The ALJ then inquired as to whether the inability to maintain concentration and focus for longer than two hours would affect the aforementioned jobs.  The VE responded that such inability would prohibit competitive employment.  (Tr. 1096-97.)

### III. DECISION OF THE ALJ

- 14 -

On September 19, 2011, following the remand from this court, the ALJ issued a decision that plaintiff was not disabled.  (Tr. 525-50.)  At Step One of the prescribed regulatory decision-making scheme,[26] the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date, January 1, 2006.  At Step Two, the ALJ found that plaintiff's severe impairments were degenerative disc disease of the cervical and lumbar spine with associated bulging disks, fibromyalgia, hepatitis C, migraine headaches, major depressive disorder, anxiety disorder, schizoaffective disorder, ADHD, personality disorder, and pain disorder associated with psychological factors and general medical condition.  (Tr. 528.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments.  (Tr. 533.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform sedentary work but limited her to unskilled work involving understanding, remembering, and performing simple instructions and non-detailed tasks, settings without constant or regular contact with the public, and work involving more than infrequent handling of customer complaints.  At Step Four, the ALJ found plaintiff unable to perform any past relevant work.  (Tr. 537-48.)

At Step Five, the ALJ found plaintiff capable of performing jobs existing in significant numbers in the national economy.  (Tr. 549.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

---

[26] See below for explanation.

- 15 -

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.   42 U.S.C. §§ 423(a)(1)(D),  (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942.   A five-step regulatory framework is used to determine whether an individual is disabled.  20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  20 C.F.R. § 404.1520(a)(4)(i)-(iii).   If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.   Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW). Id. § 404.1520(a)(4)(iv).  The claimant bears the burden of demonstrating she is no longer able to return to her PRW.  Pate-Fires, 564 F.3d at 942.  If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy.  Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V.  DISCUSSION

Plaintiff argues that (1) the ALJ erred by improperly discounting the opinions of treating psychiatrists Dr. Vangala and Dr. Kamat, (2) the ALJ erred in determining plaintiff's RFC, and (3) the ALJ's hypothetical question posed to the VE did not reflect the RFC determination.

### A. Opinions of Dr. Vangala and Dr. Kamat

Plaintiff argues that the ALJ erred by failing to properly discuss the opinions of Dr. Vangala and Dr. Kamat.  Specifically, plaintiff argues that the ALJ failed to examine the length and frequency of treatment, the nature and extent of the treatment relationships, and the treating physicians' specialization.

Social Security regulations set forth factors to assess the amount of weight afforded to medical opinions, which include the length and frequency of treatment, the nature and extent of the treatment relationship, supportability, consistency, and specialization.  20

- 16 -

C.F.R. § 404.1527.  The ALJ must "give good reasons for the weight afforded to a treating physician's evaluation."  Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005).  However, "[a]n ALJ need not explicitly discuss each of the factors in 20 C.F.R. § 404.1527(d) in deciding what weight to give a medical opinion."  Powers v. Astrue, 2011 WL 8894, *5 (W.D. Mo. 2011) (citing Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007)); cf. Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010) (noting ALJ need not explicitly discuss credibility factors).  Further, an ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000).

The ALJ stated that she afforded little weight to Dr. Vangala's opinion due to its inconsistency with the medical record, including his treatment notes.  Dr. Vangala's opinion dated April 28, 2008 sets forth several mental limitations as stated above.  (Tr. 501-09.)  However, his treatment notes indicated plaintiff's significant improvement after receiving medication, including improved mood, controlled anxiety, and no exacerbations or hospitalizations.  (Tr. 511-14.)  Dr. Kamat's subsequent treatment notes also indicate significant improvement regarding plaintiff's mental condition.  (See e.g., Tr. 933-34, 937-39.)   The ALJ further discounted Dr. Vangala's opinions regarding her physical impairments due to the lack of evidence indicating that he treated plaintiff for such impairments.  (Tr. 542.)

The ALJ stated that she afforded little weight to Dr. Kamat's opinion due to inconsistency, internally and with Dr. Kamat's treatment notes.  Dr. Kamat's opinion dated December 28, 2010 sets forth several mental limitations as stated above.  (Tr. 801-05.)  Plaintiff consistently reported improvement.  (Tr. 930, 932, 937-39, 996.)  Her complaints often coincided with failure to comply with Dr. Kamat's prescribed medication regimen or with external stressors.  (Tr. 935-36, 938, 940, 942, 944-46, 949, 997.)  She did not complain to Dr. Kamat about interactions with other people and always exhibited appropriate and cooperative behavior with him.  (Tr. 930-949, 996.)  Her focus and concentration improved after receiving an Adderall prescription.  (Tr. 936.)  The ALJ also noted the lack of evidence indicating inpatient treatment, intensive outpatient care, emergency psychiatric care, or episodes of decompensation.  (Tr. 542.)  The ALJ further found the GAF scores issued by Dr. Kamat inconsistent with his opinion.  (Tr. 542.)

The ALJ did not err in discounting the opinions of Dr. Vangala and Dr. Kamat or by affording them little weight.  Therefore, plaintiff's argument is without merit.

**B. RFC Assessment**

Plaintiff argues that the ALJ erred in the RFC determination because it does not correspond with any medical opinion in the record.  Specifically, plaintiff argues that although the ALJ afforded Dr. DeVore's opinion great weight, the RFC determination does not account for several of Dr. DeVore's findings.  Plaintiff also argues that the ALJ made several findings not reflected in the RFC determination, including the finding that plaintiff suffered moderate restrictions with concentration, persistence, and pace and that plaintiff's severe impairments included migraine headaches, major depressive disorder, anxiety disorder, schizoaffective disorder, ADHD, and personality disorder.

Although the ALJ afforded Dr. DeVore's opinion great weight due to its consistency with the medical record and to a lesser extent, plaintiff's allegations, the ALJ also stated that "Dr. DeVore's opinion likely underrepresents the claimant's functional abilities after she began receiving psychiatric treatment."  (Tr. 539-40.)  Specifically, Dr. DeVore submitted his opinion on August 31, 2007, and the record indicates that plaintiff first met with Dr. Vandala and began receiving regular psychiatric treatment on November 12, 2007.  (Tr. 351-64, 516-21.)  As set forth above, substantial evidence supports the ALJ's finding that, subsequently, plaintiff's mental condition substantially improved.

A severe impairment significantly limits physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  The ALJ found that plaintiff suffered moderate restrictions with concentration, persistence, and pace and that plaintiff's severe impairments included migraine headaches, major depressive disorder, anxiety disorder, schizoaffective disorder, ADHD, and personality disorder.  (Tr. 528, 535-36.)  Plaintiff alleges that the ALJ failed to account for these findings in the RFC determination.  However, the ALJ stated that the combination of plaintiff's mental impairments led to the inclusion of mental limitations in the RFC determination.  (Tr. 537.)  Plaintiff argues that the opinions of Dr. DeVore, Dr. Armour, Dr. Vangala, and Dr. Kamat indicate that the consequences of plaintiff's mental impairments are more severe than the RFC determination reflects.  As set forth above, substantial evidence supports the ALJ's treatment of the opinions of Dr. Devore, Dr. Vangala, and Dr. Kamat.  Further, Dr. Armour submitted his opinion on August 16, 2007, and thus, may be discounted for similar reasons.  (Tr. 345-50.)

- 18 -

Additionally, although the ALJ found several severe mental impairments, the ALJ cited several valid reasons for discounting the plaintiff's allegations regarding the intensity, persistence, and limiting effects of her impairments.  "An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole."  Van Vickle v. Astrue, 539 F.3d 825, 828 (8th Cir. 2008).   Courts defer to the ALJ's credibility determinations when good reasons and substantial evidence support them.   Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).  Failure to seek ongoing medical treatment is a factor an ALJ may consider to assess credibility.  Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010).  However, inability to pay can justify a claimant's failure to seek medical treatment.  Vasey v. Astrue, 2009 WL 4730688 at *5 (E.D. Ark. 2009).   Drug-seeking behavior may also affect a claimant's credibility.  Anderson v. Shalala, 51 F.3d 777, 780 (8th Cir. 1995).  Although not a dispositive factor, "an ALJ may consider a claimant's financial motivation to qualify for benefits."  Ramirez v. Barnhart, 292 F.3d 576, 582 (8th Cir. 2002).

Plaintiff alleged an onset date of January 1, 2006 due to mental impairments but did not seek psychiatric treatment until November 2007.  (Tr. 32.)  Further, plaintiff missed appointments and did not consistently adhere to the medication regimen recommended by her physicians.  (Tr. 514-15 940, 942.)  The record does not indicate that plaintiff received psychiatric treatment from June to December 2008, despite Medicaid covering her at that time.  (Tr. 182-87.)  As stated above, plaintiff's mental condition significantly improved when she received regular treatment and complied with medications.  The record suggests that plaintiff exhibited drug-seeking behavior and that she did not report her drug use to her physicians unless asked, which led the ALJ to find that she may have dishonestly reported her symptoms.  (Tr. 200-01, 243-53, 333-42, 556.)  On one occasion, plaintiff reported no illicit drug use, despite a positive drug screening.  (Tr. 345-50.)  Finally, on several occasions, plaintiff mentioned her application for social security benefits to medical personnel, which the ALJ found indicative of seeking medical attention for the purpose of obtaining benefits rather than receiving medical care.  (Tr. 930, 1038.)

The ALJ did not err in the RFC determination.  Accordingly, plaintiff's argument is without merit.

## C. Hypothetical Question

Plaintiff argues that the ALJ's hypothetical question posed to the VE did not reflect the RFC determination.  Specifically, plaintiff argues that the Commissioner cannot meet

its burden at Step Five because the hypothetical question excluded the RFC limitation regarding plaintiff's ability to understand, remember, and perform only simple instructions and non-detailed tasks.

Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision. Hillier v. Social Sec. Admin., 486 F.3d 359, 366 (8th Cir. 2007). Hypothetical questions should set forth impairments supported by substantial evidence on the record and accepted as true and capture the "concrete consequences" of those impairments. Id.

The ALJ omitted from her hypothetical question the RFC limitation regarding plaintiff's ability to understand, remember, and perform only simple instructions and non-detailed tasks. (Tr. 537, 1093-97.) Plaintiff argues that had the ALJ presented the RFC limitation, the VE would not have testified that such hypothetical individual could perform work as an addresser because such work requires the ability to "apply common sense understanding, to carry out detailed but uninvolved instructions," also known as Level 2 reasoning. Dictionary of Occupation Titles, 1991 WL 688702 (4th ed., 1991).

In Moore v. Astrue, 623 F.3d 599 (8th Cir. 2010), the ALJ presented a hypothetical question regarding an individual who could perform only simple job instructions and simple, routine, repetitive work activity, and the VE responded that such individual could perform jobs with Level 2 reasoning. Id. at 604. The plaintiff argued that such individual would be limited to work with the Level 1 reasoning. Id. After finding that the Level 2 reasoning definition and the limitations of the hypothetical individual could be harmonized, the Eighth Circuit concluded that the ALJ properly relied on the VE's testimony. Id.

Similarly, in Floyd v. Astrue, 2011 WL 864862, *16 (E.D. Mo. 2011), the court considered whether the ALJ's hypothetical question regarding an individual with the ability to understand, remember, and perform only simple instructions and non-detailed tasks conflicted with the VE's response that such individual could perform work with Level 2 Reasoning. Id. at *16. The court concluded that the ALJ did not err by finding that the plaintiff could perform jobs with Level 2 reasoning. Id.

The preceding cases suggest that, although the ALJ did not present the limitation regarding plaintiff's ability to understand, remember, and perform only simple instructions and non-detailed tasks, the ALJ committed harmless error. Because the subsequently included RFC limitations are, at least, not inconsistent with work requiring Level 2 reasoning, which includes addressers, substantial evidence supports the ALJ's finding that plaintiff could perform work as an addresser.

Moreover, plaintiff does not challenge the ALJ's findings that plaintiff could perform work as a table worker or sticker.  (Tr. 549.)  The VE testified that over 650,000 positions for such work exist nationally.  (Tr. 1095.)  Accordingly, even assuming that plaintiff could not perform work as an addresser due to the omitted RFC limitations, substantial evidence supports the ALJ's finding that plaintiff can perform jobs with significant numbers in the national economy.  See Weiler v. Apfel, 179 F.3d 1107, 1111 (8th Cir. 1999) (finding that VE testimony regarding the plaintiff's ability to perform a job with 32,000 nationwide positions constituted substantial evidence to support the ALJ's finding that the plaintiff could perform jobs with significant numbers in the national economy).

Plaintiff also argues that the ALJ's statement to the VE that plaintiff was limited to unskilled work due to her mental impairments is an error of law.  However, plaintiff does not argue that this error affected the outcome of the ALJ's decision.  Further, assuming that the ALJ misspoke, the record does not reflect that the VE conflated the limitations attributable to plaintiff's mental impairments and the ability to perform unskilled work. (See Tr. 1093-97.)

Substantial evidence supports the ALJ's finding that plaintiff retains the RFC to perform other work that exists in significant numbers in the national economy. Accordingly, plaintiff's argument is without merit.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.


/S/  David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on September 19. 2013.

- 21 -